# COURT OF APPEALS OF VIRGINIA

## Record No. 0033-25-2

LORENZO ADONIS BROOKS
v.
COMMONWEALTH OF VIRGINIA

Present: Judges Beales, O'Brien and Ortiz
Argued at Richmond, Virginia

Opinion Issued May 5, 2026[*]

## FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
Gordon F. Willis, Judge

(Alexander Raymond, on brief), for appellant. Appellant submitting on brief.

William K. Hamilton, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## <u>JUDGE MARY GRACE O'BRIEN</u>

Following a three-day jury trial, Lorenzo Adonis Brooks (appellant) and Aaron Randolph Carter were convicted of second-degree murder of Jasiah Smith and using a firearm in the commission of a felony. Appellant contends that the circuit court erred in finding sufficient evidence to support the jury's verdict, arguing that the Commonwealth failed to prove that he was the individual who shot Smith. Upon review, we affirm the convictions.

BACKGROUND

"[W]hen a criminal appellant challenges the sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

On March 26, 2023, around noon, appellant and Carter met at a strip mall in Fredericksburg, where cameras from one of the stores—Manshue Check & Cash—recorded them getting into a white Impala that belonged to Carter's mother. Appellant was wearing a dark blue or black jacket, black pants, and black shoes with white soles. Carter, who had short dreadlocks, wore a white sweatshirt with a distinctive design on both the front and back. At trial, Officer Uyurre Brown-Kaleopaa, who knew appellant and Carter from his former assignment as the resource officer at the local high school, identified them in the video.

At 1:16 p.m. that day, the white Impala pulled into a parking spot for appellant's home at 714 Denton Circle. Appellant, Carter, and one of their acquaintances got out of the car and started walking toward Chadwick Court.

Several neighborhood residents had security cameras that captured the incident. The footage showed a group of young men gathering in the parking lot of Chadwick Court. Around 2:55 p.m., an altercation broke out among several individuals behind a parked car; still-shots of the video showed two individuals raising their arms. Five seconds later, appellant backed up from behind the car with his arm outstretched and a gun in his hand, pointing at the area behind the car. Several other individuals ran away. Another five seconds later, Carter emerged from behind the car and also ran away.

Kerri Farr witnessed the shooting. She and her husband were walking near Chadwick Court where she saw a group of people in "a semicircle around one young man." She heard a loud noise, and when she looked over, she saw "somebody raise their arm and shoot [the young man]," who fell to the ground. She observed two men "standing over him, and . . . empty[ing] the rest of the gun into his body." At trial, Farr testified that she remembered that one of the men

standing over Smith had "small little dreadlocks and a white hoodie with a design on the front" and that he had his arm "extended shooting the victim." After the shooting, she saw the men scatter and one car speed away.[2]

William Wallace, a Chadwick Court resident, went outside after hearing a loud noise and discovered Smith in a fetal position with "a hole in his chest." Wallace saw a gun next to Smith. Because he was worried someone may get hurt, he took the gun and put it in his backyard.[3]

Detective Johnny Wright reviewed the security camera footage and determined that appellant and Carter had fled from Chadwick Court to 714 Denton Circle after the shooting. In the footage, the two men were wearing the same clothes as they did earlier in the day at Manshue Check & Cash. Both individuals ran with one hand in their pocket.

A camera facing the backyard of 710 Denton Circle recorded appellant and Carter jumping the fence of 714 Denton Circle at 2:56 p.m., just one minute after the shooting. The video showed one person wearing a black top, the other a white one. At 3:02 p.m., the camera captured a blue object being thrown over the fence into the wooded area behind the houses. Two minutes later, at 3:04 p.m., the front-facing camera of 710 Denton Circle showed two individuals get into the white Impala parked in front of 714 Denton Circle and drive off.

At the time, Taylor Rakes lived at 716 Denton Circle. She observed "two males hop the fence" of 714 Denton Circle. She testified that they threw something "dark-colored" "down the hill," and she heard a "loud clank."

Responding to 911 calls, Fredericksburg Police Department (FPD) officers arrived at Chadwick Court and found Smith, who was unresponsive. Smith was transported to the hospital

---

[2] Police officers later located the car but found "[n]othing significant" in it.

[3] A short time later, Wallace approached a Fredericksburg Police Department detective, who recovered the gun from Wallace's backyard.

and pronounced dead. The medical examiner determined that Smith died from "[m]ultiple gunshot wounds," and she identified "a total of twelve gunshot wound injuries." She recovered two bullet fragments from Smith's body.

During the investigation, detectives recovered eleven nine-millimeter spent cartridge casings as well as a bullet fragment in the Chadwick Court parking lot. The FPD also executed a search warrant for 714 Denton Circle a few days after the shooting. During that search, Rakes approached the lead detective and told him about seeing two individuals hop the fence and throw something into the wooded area behind the houses. The detectives subsequently discovered two firearms in that area, one on the ground, the other in an unraveled blue shirt. Both guns were nine-millimeter Glock pistols.

Megan Korneke, a forensic scientist in the firearm section of the Virginia Department of Forensic Science, examined all the guns and cartridges involved in this case. She concluded that the two guns recovered from the wooded area behind 714 Denton Circle fired all of the cartridges found at the scene of the shooting—four of which were fired by one of the guns, seven by the other one. Smith's gun did not fire any cartridges found in connection with this case. Korneke also examined two bullet fragments recovered from Smith's body, both of which were fired by one of the guns found behind 714 Denton Circle.

An FPD detective located appellant and Carter together in Marlboro, Maryland, and the men were extradited to Virginia. A grand jury indicted appellant and Carter for first-degree murder and the use of a firearm in a felony. Upon motion by the Commonwealth, appellant and Carter were tried together. After a jury trial, both defendants were found guilty of second-degree murder and using a firearm in the commission of a felony, and each was sentenced to 43 years' imprisonment with 15 years suspended.

ANALYSIS

### I. Standard of Review

"In reviewing a challenge to the sufficiency of the evidence to support a conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Melick v. Commonwealth*, 69 Va. App. 122, 144 (2018) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)). "In conducting our analysis, we are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'" *Id.* (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "Thus, we will affirm the judgment of the trial court unless that judgment is 'plainly wrong or without evidence to support it.'" *Id.* (quoting *Kelly*, 41 Va. App. at 257).

### II. Sufficiency of the Evidence

Appellant argues that the evidence was insufficient to prove the shooter's identity. According to appellant, the evidence only showed that he was one of many people at the location of the shooting, and no witness or forensic evidence directly tied him to the crime. Finally, appellant posits that because the guns were not found until several days after the incident, "the real assailant" had time to deposit them in that area.

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013)

(quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). Like any element of a crime, identity may be proven by circumstantial evidence. *See Commonwealth v. Moseley*, 293 Va. 455, 465 (2017) (affirming defendant's convictions for breaking and entering and grand larceny when he was seen pulling away from the curb next to the burgled residence at the relevant time, was arrested near the second burglary, and his vehicle contained stolen items).

"[C]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Smith v. Commonwealth*, 85 Va. App. 435, 456 (2025) (alteration in original) (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019)). "This Court does not view circumstantial evidence in isolation." *Id.* (quoting *Lucas v. Commonwealth*, 75 Va. App. 334, 346-47 (2022)). "Rather, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Lucas*, 75 Va. App. at 347 (quoting *Karnes v. Commonwealth*, 125 Va. 758, 764 (1919)). "The pertinent question in this appeal is whether a rational factfinder, in light of all the evidence, could have rejected [the defendant's] theories of innocence and found him guilty beyond a reasonable doubt." *Walker v. Commonwealth*, 79 Va. App. 737, 748 (2024) (alteration in original) (quoting *Moseley*, 293 Va. at 464).

Here, the totality of both direct and circumstantial evidence was sufficient for a rational factfinder to reject appellant's hypothesis that he did not shoot Smith and that someone else deposited the guns behind appellant's house. Officer Brown-Kaleopaa, who knew appellant, identified him in the Manshue Check & Cash video—recorded only hours before the shooting— wearing a dark blue or black puffer jacket, black pants, and black shoes with white soles. Officer Brown-Kaleopaa also identified Carter, who was wearing a white sweatshirt with a distinct design on it. Both Carter and appellant got into Carter's white Impala. A little later that day, the white

Impala parked in front of 714 Denton Circle, appellant's residence at the time, and appellant and Carter exited the vehicle. Further, on brief, appellant acknowledged that the evidence "showed that [he] was *at the location of the* crime" along with other individuals. (Emphasis added).

Appellant emphasizes that Farr, the eyewitness, did not identify him as a shooter but rather described someone wearing a white sweatshirt and having dreadlocks—a description that fits Carter. But Farr did testify that she saw two men standing over Smith, "empty[ing] the rest of the gun into his body." Further, security camera footage showed appellant backing up from behind the parked car, where officers found Smith's body. He has his arm outstretched and is pointing a gun at the area behind the car.

Based on footage from several home security cameras, Detective Wright was able to reconstruct appellant and Carter's flight through the neighborhood, running from Chadwick Court toward appellant's home. Both ran with their hoods up and one hand in their pocket. Appellant's neighbor, Rakes, saw the two men jump the fence behind appellant's house and throw an item into the back wooded area, which made a "loud clank." Another neighbor's security camera recorded these actions.

A few days later, the FPD recovered two guns from the wooded area behind appellant's house; forensic examiners found that all eleven cartridges recovered from the Chadwick Court parking lot were fired by those two guns—four by one of the guns, seven by the other one. Similarly, two bullet fragments recovered from Smith's body were also fired by one of those two guns. The medical examiner determined that Smith suffered twelve gunshot wounds. Based on that evidence, the jury could have concluded that appellant shot at least some of the bullets that hit and ultimately killed Smith.

Finally, only minutes after the shooting, footage from a security camera on 710 Denton Circle showed two individuals coming from appellant's home and getting into Carter's white

Impala, parked in a spot reserved for the residence; the individuals left together. Appellant and Carter were later discovered together in Maryland. "Any flight at a time when it may be to avoid arrest, prosecution, or confinement tends to show a consciousness of guilt." *Langhorne v. Commonwealth*, 13 Va. App. 97, 103 (1991).

Based on that evidence, a reasonable jury could determine that appellant was one of the shooters. *See Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022) ("[W]e, on appellate review, view video evidence . . . for the limited purpose of determining whether any rational factfinder could have viewed it as the [jury] did."). The facts were sufficient to support the factfinder's rejection of appellant's theory that he did not shoot Smith. *See Moseley*, 293 Va. at 464.

## CONCLUSION

For these reasons, we affirm the court's judgment.

*Affirmed.*